**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA      :     Crim. No. 1:24-CR-00020
                        :
                        :
                        :
         v.                  :
                        :
                        :
WALI YOUNG                :     Judge Jennifer P. Wilson

**MEMORANDUM**

Defendant Wali Young ("Young") stands accused of several drug-related offenses.  Law enforcement gathered evidence of Young's guilt while executing a search warrant against co-defendant Akbar Turner ("Turner")—a man who lived in the same building as Young.  Young moves to suppress this evidence.  He contends that officers searched his room without lawful authority and thereby violated his Fourth Amendment rights.  The court agrees that Young's rights were violated and that exclusion of the unlawfully obtained evidence is warranted here.  Therefore, for the reasons set forth below, the court will grant Young's motion to suppress.

FINDINGS OF FACT

**A. Investigation of Turner**

In the fall of 2022, the Harrisburg Bureau of Police ("HBP") was investigating drug-trafficking activities with the help of a confidential informant ("CI").  The CI informed Detective Jason Paul ("Detective Paul") that he could buy a quantity of cocaine from a person named "Ookey" who lived on 16th Street

1

in Harrisburg.  (Hr'g Tr. 6:23–7:6.[1])  The CI then agreed to participate in a controlled purchase of cocaine from Ookey while being monitored by police. (Gov't Ex. 1, p. 2.[2])

The controlled purchase occurred on October 1, 2022.  (Hr'g Tr. 5:22–25.) The CI initiated the transaction by calling Ookey in the presence of Detective Paul and asking to purchase a specific quantity of cocaine.  (Hr'g Tr. 7:10–13.)  Ookey agreed and told the CI to come pick up the order.  (Hr'g Tr. 7:13–14.)  Detective Paul searched the CI's person and vehicle before the transaction and confirmed that neither concealed illegal items or United States currency.  (Hr'g Tr. 7:14–17.) The CI provided Detective Paul with Ookey's phone number and an approximate location of where the transaction would occur.  (Hr'g Tr. 7:7–8.)  Surveillance units witnessed the entire transaction.  (*See* Hr'g Tr. 7:21–8:9.)  The CI drove to 16th Street, where a man exited the three-story townhome at 18 South 16th Street ("the Premises"), went immediately into the CI's vehicle, stayed there for a brief amount of time, and immediately returned to the Premises upon leaving the vehicle.  (*Id.*)

---

[1] Citations to "Hr'g Tr." refer to a rough draft transcript that the court requested from the court reporter.  The official transcript has not been requested by the parties to date.  The court notes that the official transcript, if ultimately requested, may differ from the rough draft.

[2] Citations to "Gov't Ex." refer to the Government's exhibits that were admitted at the December 22, 2025, evidentiary hearing.  For ease of reference, the court uses the page numbers from the CM/ECF header.

Ookey was, in fact, Turner.  Police determined that the phone number the CI provided was associated with a Cash App account owned by Turner.  (Hr'g Tr. 12:2–12.)  Also, a member of the surveillance team positively identified Turner as the man who entered the CI's vehicle during the controlled purchase.  (Hr'g Tr. 12:20–25.)

Following the transaction, the CI and Detective Paul met at a prearranged location where the CI turned over a plastic bag filled with white powder.  (Hr'g Tr. 8:7–9; 9:21–24.)  Detective Paul visually identified the substance as cocaine based on its appearance and the quantity being consistent with the amount of money paid by the CI for the purchase.  (Hr'g Tr. 10:20–24.)  He did not field test the substance, because HBP's practice was to conduct such tests only when a controlled purchase yielded an unexpected substance.[3]  (Hr'g Tr. 10:5–14.)  The results of the controlled purchase led Detective Paul to seek a warrant to search the Premises.

### B. The Turner Warrant

On October 4, 2022, Detective Paul submitted an application for a search warrant, which listed the Premises and Turner as the place and person to be

---

[3] Detective Paul testified that it typically takes the Pennsylvania State Police drug testing lab between one and three months to issue official testing reports.  (Hr'g Tr. 16:17–22.)  It is not Detective Paul's practice to wait for these official reports before he seeks search warrants.  (Hr'g Tr. 16:23–17:1.)  Testing eventually confirmed that the white substance procured by the CI was cocaine.  (Hr'g Tr. 58:3–10.)

searched. ("Turner Warrant"). (Gov't Ex. 1.) The application identified the

following items to be searched for and/or seized: "[a]ny cocaine, [d]rug

[p]araphanallia [sic] drug proceeds not limited to pre-recorded Dauphin County

funds, and [the] cell phone" associated with the number provided by the CI. (*Id.* at

1.)

Accompanying the application was an affidavit of probable cause written by

Detective Paul. (*Id.* at 2.) The affidavit provided, in part, the following

background in support of the application:

> Within the last 72hrs a reliable confidential informant (CI) relayed that they could purchase a quantity of cocaine from a male known to them as "OOKEY," later identified as Akbar Turner [DOB]. The CI stated that Turner is to be a bartender at Piccolos bar in Harrisburg City. The CI agreed to make a purchase of Cocaine from Turner while being monitored by police. The CI informed me that Turner was to live in the first block of S 16th St about midblock on the West side of the street. I searched the CI and their vehicle before this transaction and did not locate any illegal items or US currency during this search. I provided the CI with prerecorded Dauphin County funds (NC15661722A, PF52753907D, PF919874902B, MF69080433F, NF82272619C MD52766004E, IG49578752E, MC86862499D) to complete this transaction. The CI placed a phone call to Turner at (215) 554-7214 in my presence and on speaker phone and ordered a quantity of cocaine. [T]he male agreed to this and told the CI to come through. Surveillance units went to the area and attempted to position themselves to locate which door Turner was coming from on S 16th St. I followed the CI into the area and was 2 cars behind them on S 16th St. I observed Turner come from a door, which I believed to be 18 S 16th St., and walk directly to the CI vehicle and enter. I notified surveillance units of the residence and Det Ishman positioned himself where he could observe the CI vehicle and the front of 18 S 16th St. I drove past the CI vehicle and parked around the corner to follow them after the transaction. Det Ishman relayed via radio that Turner exited the vehicle and walked

directly back into 18 S l6th St.  I followed the CI from the area and met with them at a pre-determined meeting area.  The CI turned over a quantity of cocaine to me at that time.  I searched the CI and their vehicle again after this transaction and they did not possess any illegal items or the pre-recorded Dauphin County Funds.  The CI never left the view of detectives after being searched and did not meet with any persons other than Turner.

The phone number (215) 554-7214 was ran and found that it was linked to a cashapp account belonging to Akbar Tuner.  It was also found that Tuner [sic] place of employment was to be Piccolos bar in [sic] I showed a picture of Turner to Det Bell and he did positively identify Turner as the person that entered the CI vehicle during this investigation.

Affiant requests a search warrant for the listed property and curtilage. In the affiant's experience persons involved in the distribution of illegal narcotics often keep additional narcotics in their residence as well as drug proceeds.

(*Id.*)  A Pennsylvania judge approved the Turner Warrant the same day Detective Paul submitted his application.  (Hr'g Tr. 13:15–20.)

## C. Execution of the Turner Warrant

### i.  Entry

HBP personnel executed the Turner Warrant on October 5, 2022.  (Hr'g Tr. 19:14–16.)  Around 6:00 a.m., members of the warrant service team ("Entry Team") announced themselves at the Premises' front door and forced entry into the structure.  (Hr'g Tr. 19:16–20:10.)  Members of the Entry Team included, in relevant part, Lieutenant Tom McGarrity ("Lieutenant McGarrity"), Corporal Jacobbi Harper ("Corporal Harper"), and Corporal Travis Banning ("Corporal

Banning"). Detective Paul was not a member of the Entry Team. (Hr'g Tr. 44:2–7.)

The Entry Team wore body-worn cameras that captured the events at the Premises. Upon their entrance, the Entry Team immediately encountered two individuals on a staircase directly in front of the door. (Gov't Ex. 9, 2:50–2:56.[4]) Both were at the top of the stairs, one in front of the other. (Gov't Ex. 2, 2:12–2:20.[5]) Turner, the man in front, began walking down the stairs, followed by Young. (*Id.*) Officials detained both men. (*Id.* at 2:20–2:45.) Within approximately 16 seconds of being detained, Turner informed Lieutenant McGarrity that the Premises was a rooming house. (Gov't Ex. 9, 2:59–3:15.) Law enforcement understood Turner's statement to mean that the landlord or a resident was renting out individual rooms of the Premises. (*See* Hr'g Tr. 78:4–12.)

Rooming houses are common throughout Harrisburg. (Hr'g Tr. 78:4–8.) However, a license or zoning approval from the city is needed in order to operate one. (*See* Doc. 60-3, p. 3) HBP maintains a list of rooming houses within the city that operate under the proper approvals. (Hr'g Tr. 62:9–14.) Before executing the Turner Warrant, officers checked to see if the Premises was on this list of sanctioned rooming houses. (Hr'g Tr. 62:20–24.) It was not, so officers assumed

---

[4] Government Exhibit 9 is the footage from Lieutenant McGarrity's body-worn camera.

[5] Government Exhibit 2 is the footage from Officer Jermey Crist's body-worn camera.

the Premises was a single-family home in which Turner was living by himself. (Hr'g Tr. 61:2–10.)  Once Turner told officers that the Premises was a rooming house, they immediately concluded it was an illegal rooming house.  (Hr'g Tr. 62:20–63:6.)  The distinction between legal and illegal rooming houses ultimately had no effect on law enforcement's work.  HBP's practice is to treat any rooming house as a multi-unit dwelling, regardless of its legality.  (Hr'g Tr. 19:6–13.)

The Entry Team's objective once inside the Premises was to make it safe for investigators.  (Hr'g Tr. 101:24–102:5.)  In general, HBP considers the execution of drug-related warrants to involve an increased threat of violence, since the possession of illicit narcotics is often accompanied by the possession of firearms to protect product and proceeds.  (Hr'g Tr. 73:14–19.)  This is why HBP considers these "high-risk" warrants.  (Hr'g Tr. 73:14–15.)  To ensure officer safety, the Entry Team performed a protective sweep of the entire Premises, which was HBP's typical practice for rooming houses.  (Hr'g Tr. 101:3–9.)  The purpose of the sweep was to search for potentially dangerous individuals, rather than the evidence detailed in the Turner Warrant.  (*See* Hr'g Tr. 76:19–77:1.)

### ii.  Protective Sweep of Young's Room

The Premises' second floor had three bedrooms: one at the rear of the structure ("Young's Room"), one in the middle, and one at the front ("Turner's Room").  The Entry Team entered each one in performing the protective sweep.

Of particular importance here is the sweep of Young's Room, which Lieutenant McGarrity, Corporal Banning, and Corporal Harper carried out. Lieutenant McGarrity and Corporal Banning were the ones who actually searched Young's Room. Corporal Harper's role was more limited. He stayed in the second-floor hallway and escorted located individuals downstairs to the living room, where others were being held during the search. (Hr'g Tr. 102:13–18.) Corporal Harper never entered any of the bedrooms during the protective sweep. (Hr'g Tr. 102:19–22.)

The door to Young's room was closed and locked when Lieutenant McGarrity and Corporal Banning initially approached it. (Hr'g Tr. 92:21–22.) To gain access, Corporal Banning breached the door. (*Id.*) The inside of Young's Room was so dark that it would have been impossible to see anything had it not been for the officers' flashlights. (Gov't Ex. 9, 5:25–53:35.) The lights in the room remained off for the entire time the officers were inside the room conducting the protective sweep. (Hr'g Tr. 93:6–11.)

In total, the sweep of Young's Room lasted approximately 90 seconds. (Gov't Ex. 9, 5:25–6:55.) Corporal Banning entered first behind a police shield. (Gov't Ex. 8, 5:35–5:47.[6]) He then spent about 20 second searching the room from

---

[6] Government Exhibit 8 is the footage from Corporal Banning's body-worn camera.

behind the shield. (*Id.* at 5:40–6:00.) The shield caused Corporal Banning to lose "a lot" of his peripheral vison; he could only see through the shield's four-by-twelve-inch glass window. (Hr'g Tr. 114:23–115:5.) After the initial 20 seconds, Corporal Banning then spent about 25 seconds searching in and under the bed without the shield. (Gov't Ex. 8, 6:00–6:25.) He then left the room about 25 seconds later. (*Id.* at 6:25–6:51.) At no time did Corporal Banning look behind the door to Young's Room.

Upon his own entry, Lieutenant McGarrity shined his flashlight on the bed, into a closet, and behind the bedroom door in a span of about four seconds. (Gov't Ex. 9, 5:34–38.) He then spent the rest of his time more closely examining the closet, the area surrounding the bed, and an outside porch accessible from Young's Room. (*Id.* at 5:40–6:55.) He did not look again behind the door.

Neither Corporal Banning nor Lieutenant McGarrity recalled seeing anything noteworthy in Young's Room. (Hr'g Tr. 83:7–10; 115:22–25.) Both officers' body-worn cameras confirm that, indeed, neither officer noticed anything unusual in Young's Room. (Gov't Ex. 8, 5:35–6:51; Gov't Ex. 9, 5:25–6:55.)[7]

---

[7] Lieutenant McGarrity testified that he believes officers conducted a secondary protective sweep of Young's Room. (Hr'g Tr. 94:20–95:5.) The court does not credit this testimony. Lieutenant McGarrity could not recall who performed this secondary search and only believes one was done because it was customary for such secondary sweeps to occur. (Hr'g Tr. 96:1–5.) Moreover, Lieutenant McGarrity testified that body-worn cameras likely would have captured this later sweep, Hr'g Tr. 96:6–10, and none of the admitted video evidence depicts a second sweep of Young's Room.

### iii. Detective Paul's Conversation with Turner

Detective Paul arrived at the Premises later than the Entry Team. (*See* Hr'g Tr. 44:18–23.) Unlike the Entry Team, Detective Paul was not wearing a body-worn camera, as was standard operating procedure for non-uniformed law enforcement. (Hr'g Tr. 20:14–21.) Detective Paul first learned that the Premises was a rooming house as soon as he arrived there. (Hr'g Tr. 44:24–45:2.)

Shortly after his arrival, Detective Paul spoke privately with Turner in the Premises' kitchen on the first floor. (Gov't Ex. 2, 10:55–11:00.) Detective Paul introduced himself to Turner and read him his *Miranda* rights, which Turner confirmed he understood. (*Id.* at 11:00–11:12.) Detective Paul explained that law enforcement was at the Premises because they had information Turner was selling narcotics therefrom. (*Id.* at 11:13–11:16.) He then explained that because the Premises is a rooming house, Turner had two options: Either Turner could give officers consent to search his room and the common area, or law enforcement could seek an amended search warrant before proceeding. (*Id.* at 11:16–11:39.) Eventually, Turner gave officers consent to search his room. (*Id.* at 12:57–13:00.)

### iv. Search of Turner's Room

Turner and Detective Paul then walked together to Turner's Room. (*Id.* at 13:10–13:30.) A forensic photographer was already taking photos of Turner's Room when the two men arrived there. (*Id.* at 13:30–13:50.) Law enforcement's

search of Turner's Room yielded a rifle, the cellphone used to set up the controlled purchase, cocaine, and three bags of heroin. (Hr'g Tr. 23:7–11; Gov't Ex. 1, p.3.) These small plastic bags were bundled together using what appears to be a rubber band and bore a red stamp located on the top of the bundle. (Gov't Ex. 3.)

### v. Heroin Purportedly Found in Young's Room

After the search of Turner's Room, Corporal Harper supposedly informed Detective Paul that he was told drugs were found in plain view in Young's Room during the protective sweep. (Hr'g Tr. 46:8–20; 103:13–19.) Both Detective Paul and Corporal Harper each testified that they recalled their interaction. (Hr'g Tr. 46:8–20; 103:13–19.) However, no evidence depicts anyone telling Corporal Harper about the drugs supposedly found during the protective sweep. Corporal Harper testified that such a conversation would have been captured by his body-worn camera, Hr'g Tr. 105:11–25, but then acknowledged that his body-worn camera footage does not depict anything of the sort. (Hr'g Tr. 108:20–25.) He also testified that he wrote no independent report about the conversation. (Hr'g Tr. 105:18–20.)

Upon supposedly learning about the drugs in Young's Room, Detective Paul asked Corporal Harper to show them to him. (Hr'g Tr. 28:12–16.) Detective Paul wanted to see the drugs for himself, because he was going to be the affiant on the required additional search warrant application. (Hr'g Tr. 29:14–19.) Detective

11

Paul remembered seeing two heroin bags "right inside the door to Young's Room." (Hr'g Tr. 30:15–16.) According to him, one "didn't really have to walk into the room" to see them. (Tr. 30:18–19.) This is not accurate. In fact, photographs of the bags indicate that they were found behind the door to Young's Room. (Gov't Ex. 4.) It would have been impossible to see the bags without entering the room. (*See id.*)

The "bags" were really small pieces of what looked like ordinary wax paper.[8] In Detective Paul's experience, heroin bags are often made by folding the edges of such paper and heat sealing it. (Tr. 48:21–49:4.) Neither bag had any amount of heroin that Detective Paul could observe.[9] (Hr'g Tr. 49:24–50:1.) One of the bags was a piece of plain white paper, which Detective Paul acknowledged he would not have recognized, by itself, as a heroin bag. (Hr'g Tr. 49:11–17.) What made him think these two bags were heroin bags was the red stamp located in the corner of the second bag. (Hr'g Tr. 49:14–15.) This red stamp was the same as the one found on the heroin bags in Turner's Room.[10] (Hr'g Tr. 28:19–22.)

---

[8] The court observed these bags in court during the evidentiary hearing on Young's motion. The bags' appearance was the same as it had been when they were seized from the Premises. (Hr'g Tr. 32:24–33:3.)

[9] The bags were never tested for heroin either. (Hr'g Tr. 50:3–4.)

[10] Detective Paul's examination of Young's Room was not captured on Corporal Harper's body-worn camera. Corporal Harper testified that he would have turned his camera on if he escorted Detective Paul to Young's Room, unless the forensic photographer was taking pictures. (Hr'g Tr. 109:21–110:9.) HBP policy, according to Corporal Harper, precludes such body-worn camera use while such forensic examination is occurring. (Hr'g Tr. 109:22–110:2.) The court

12

Upon viewing these two bags, Detective Paul purportedly told Corporal Harper to "hold the room" while he sought an additional search warrant for it. (Hr'g Tr. 28:22–25.)  Detective Paul did not recall if he asked Young or anyone detained at the Premises about these bags.  (Hr'g Tr. 33:6–13.)  In fact, Detective Paul had only one interaction with Young.  After the search of Turner's Room, Detective Paul learned Young had an outstanding arrest warrant from New Jersey. (Hr'g Tr. 26:21–27:4.)  So he asked Young if he lived at the Premises.  (Hr'g Tr. 27:1–4.)  Young apparently responded that he had just spent the night there in Turner's Room.  (*Id.*)

## D. The Young Warrant

Detective Paul subsequently prepared an application for a warrant to search the "2nd floor rear bedroom" of the Premises ("Young Warrant").  (Gov't Ex. 7.) The affidavit of probable cause accompanying this new application provides, in part, the following background:

> On 10/05/22 at approx. 0605Hrs Harrisburg City Vice executed a search warrant at 18 S 16th St for drug sales from this residence from Akbar Turner.  The CI had provided information that Turner and a male only known to them as "Walley" were to be selling cocaine from this residence.  Entry was made and it was found that this was a rooming house.  Entry units made contact with a male later identified as Walih [sic] Young who was coming down the steps from the 2nd floor to the first floor.  Young was detained at that time and Turner was also located on the 2nd floor.  Other occupants of the residence were located in the

notes, though, that this HBP policy did not stop others from using their body-worn cameras while forensic photographs were being taken. (Gov't Ex. 2, 13:30–13:50.)

13

residence and brought into the living room area. I spoke with Young in private where he admitted that the 2nd floor front room was his and did admit to there being cocaine in this room. The room was searched and the cellular phone used for the transaction, approx. 10 grams of cocaine, heroin bundles with red print, and a rifle were located. I read all of the occupants their Miranda warnings and all denied of any illegal activities and all were checked for active warrants. I was notified that Young did have an active warrant from New Jersey and they wanted to extradite him. I spoke with Young at that time and asked him which room was his. He stated that he did not live here and was just staying the night in the room with his friend Turner. I looked at Young drivers [sic] license and it had 18 S 16th St listed as his address. I asked him if the 2nd floor rear room was his and he denied this. I asked the other tenants whose room this was and everyone stated that they did not know. I was notified by Off Harper that while clearing this room on entry they observed heroin bags in plain view. Off Harper took me up to this room and showed me white heroin bags with red stamp that appeared to be the same bags as located in Turner['s] room. I informed Off Harper that we would be applying for an additional search warrant for this room and for them to stay outside and secure the room until a search warrant could be obtained.

(*Id.* at 2.) A Pennsylvania judge approved Detective Paul's application the same day. (*Id.* at 1.)

With the Young Warrant in hand, Detective Paul went back to the Premises and executed the search. (Hr'g Tr. 39:9–12.) In Young's Room, officers found, *inter alia*, two firearms, multiple digital scales, a bag of pills, and 2 vacuum-sealed bags of heroin. (Gov't Ex. 7, p. 3.) These vacuum-sealed bags consisted collectively of about 4,850 smaller bags of heroin. (Hr'g Tr. 58:11–16.)

14

## PROCEDURAL POSTURE

On January 31, 2024, a federal grand jury returned an indictment against Young and Turner.  (Doc. 1.)  The indictment charges Young with (1) conspiracy to distribute and possess with intent to distribute a controlled substance in violation of 18 U.S.C. § 846; (2) possession with intent to distribute a controlled substance in violation of 18 U.S.C. § 841; (3) possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924; and (4) possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g).  (Doc. 1, p. 1, 5, 6, 8.)  Young pleaded not guilty to these charges.  (Doc. 16.)

On July 14, 2025, Young filed a motion to suppress evidence seized at the Premises.  (Doc. 58.)  Young's motion raises several Fourth Amendment issues, including whether the Young Warrant was defective under *Franks v. Delaware*, 438 U.S. 154 (1978).  (Doc. 58, p. 1.)  Accompanying Young's motion was a brief in support.  (Doc. 81.[11])  The Government responded with a brief in opposition. (Doc. 73.)  Upon review of these briefs, the court determined that Young had made the necessary showings needed to justify convening an evidentiary hearing on every issue raised.  (Doc. 74.)  The court held the evidentiary hearing on December

---

[11]  Young initially filed his brief in support without a title page, table of contents, or table of authorities.  (Doc. 60.)  Young later refiled his brief to include these elements.  (Doc. 81.)

15

22, 2025.  Neither party requested or filed post-hearing briefing.  Young's motion is now ripe for resolution.

## STANDARD OF REVIEW

The Fourth Amendment to the United States Constitution guarantees, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "[T]he chief evil against which" the Fourth Amendment was intended to protect was "physical entry of the home."  *United States v. White*, 748 F.3d 507, 510–11 (3d Cir. 2014) (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984)).  Accordingly, warrantless searches of a home "are presumptively unreasonable."  *Kentucky v. King*, 563 U.S. 452, 459 (2011) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)); *accord White*, 748 F.3d at 511.  This presumption applies with equal force to rooms in rooming houses.  *See McDonald v. United States*, 335 U.S. 451, 454–55 (1948) (explaining that "there must [have] be[en] compelling reasons to justify the absence of a search warrant" during search of a room in a rooming house.); *United States v. Whitted*, 541 F.3d 480, 488 (3d Cir. 2008) (citing *McDonald* for the proposition that "living quarters in rooming house" enjoy Fourth Amendment protection).

Of course, several "well-defined exceptions to [the warrant] rule" exist. *Mitchell v. Wisconsin*, 588 U.S. 840, 847 (2019). One exception permits a

warrantless search if done as part of a "protective sweep." *Maryland v. Buie*, 494 U.S. 325, 334–36 (1990). In *Buie*, the Supreme Court explained that officers may search "spaces immediately adjoining [a] place of arrest from which an attack could be immediately launched." *Id.* at 334. Searches beyond that immediate area of arrest are also permissible when law enforcement possess "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."[12] *Id.* The search justified under such circumstances is "not a full search of the premises" but, instead, "a cursory inspection of those spaces where a person may be found." *Id.* at 335. So, too, the protective sweep may "last[] no longer than is necessary to dispel the reasonable suspicion of danger." *Id.* at 335–36.

A violation of the Fourth Amendment is not sufficient to justify suppression of ill-begotten evidence. *United States v. Katzin*, 769 F.3d 163, 170 (3d Cir. 2014) (en banc). Indeed, "there is no constitutional right to have the evidentiary fruits of an illegal search or seizure suppressed at trial." *Id.* To deter future violations of the Fourth Amendment, however, courts have developed the exclusionary rule,

---

[12] *Buie* discusses protective sweeps in the context of in-home arrests. *See* 494 U.S. at 328. But protective sweeps are also permissible in the context of executing search warrants. *Drohan v. Vaughn*, 176 F.3d 17, 22 (1st Cir. 1999); *see United States v. Starnes*, 741 F.3d 804, 810 (7th Cir. 2013) ("[T]he constitutionality of a protective sweep does not depend on whether that sweep is incidental to a search warrant, an arrest warrant, or a consensual search.").

17

which "prevent[s] the government from relying at trial on evidence obtained in violation of the [Fourth] Amendment's strictures." *United States v. Werdene*, 883 F.3d 204, 215 (3d Cir. 2018) (quoting *United States v. Franz*, 772 F.3d 134, 145 (3d Cir. 2014)). Deterrence of future violations is the "sole purpose" of the exclusionary rule; "it is not meant "to 'redress the injury' occasioned by an unconstitutional search." *Davis v. United States*, 564 U.S. 229, 236–37 (2011) (quoting *Stone v. Powell*, 428 U.S. 465, 486 (1976)). Consequently, "[r]eal deterrent value is a 'necessary condition for exclusion.'" *Id.* at 236 (quoting *Hudson v. Michigan*, 547 U.S. 586, 596 (2006)).

Achieving deterrence comes with costs, which "include interfering with courts' truth-seeking function, and more specifically, concealing 'reliable, trustworthy evidence bearing on guilt or innocence' and, in some instances, 'set[ting] the criminal loose in the community without punishment.'" *United States v. Caesar*, 2 F.4th 160, 169 (3d Cir. 2021) (quoting *Davis*, 564 U.S. at 237). These costs make exclusion a "bitter pill" to swallow, *Davis*, 564 U.S. at 237, and appropriate only as a " last resort, not [a] first impulse." *Herring v. United States*, 555 U.S. 135, 140 (2009) (quoting *Hudson*, 547 U.S. at 591). Ultimately, application of the exclusionary rule requires balancing the potential for deterrence against these "substantial social costs.'" *Katzin*, 769 F.3d at 171 (quoting *United States v. Leon*, 468 U.S. 897, 907 (1984)).

18

"[T]he culpability of [an] officer's misconduct [is] at the center of the deterrence analysis." *Caesar*, 2 F.4th at 169.  The exclusionary rule applies only when "police conduct [is] sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144.  To meet this standard, the conduct must be "deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Id.*  Conversely, "the deterrent value of suppression is diminished" to the point that exclusion is unwarranted when police "conduct involves only simple, 'isolated' negligence," *Davis*, 564 U.S. at 238, or when police had an "objectively 'reasonable good-faith belief' that their conduct was lawful." *Davis*, 564 U.S. at 238.  Therefore, courts must consider "whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." *Herring*, 555 U.S. at 145 (quoting *Leon*, 468 U.S. at 922 n. 23).

DISCUSSION

Young contends that law enforcement contravened the Fourth Amendment in several ways.  The court considers each argument, as necessary, in turn.

**A. Validity of Turner Warrant**

Young's first argument is that law enforcement was not legally present in the Premises because the Turner Warrant was unsupported by probable cause.

19

(Doc. 81, pp. 23–27.)  His position, more specifically, is that police included insufficient facts in the Turner Warrant's affidavit of probable cause to link the Premises to Turner's alleged drug trafficking activity.  (*Id.*)  According to Young, the Third Circuit held in *United States v. Williams*, 974 F.3d 320 (3d Cir. 2020), that such a link requires evidence that Turner was engaged in drug trafficking "on a significant scale or for an extended period of time."  (*Id.* at 26 (quoting *Williams*, 974 F.3d at 351).)  Young is wrong.

For the Turner Warrant to issue, the approving magistrate had to have "ma[de] a practical, common-sense decision [that], given all the circumstances set forth in the affidavit [of probable cause] . . . there is a fair probability that contraband or evidence of a crime will be found [at the Premises]."  *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  This court's review of that magistrate's probable-cause finding is not plenary.  Instead, the court's role is "to determine whether the magistrate had a substantial basis for concluding that probable cause existed."  *Id.* (quoting *Gates*, 462 U.S. at 238.); *accord United States v. Alexander*, 54 F.4th 162, 171 (3d Cir. 2022).

A search warrant can properly issue even without direct evidence that contraband will be found in the place to be searched.  *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001).  Magistrates can infer that a drug dealer is keeping

evidence of drug crimes at his home when evidence supports "three preliminary premises: (1) that the person suspected of drug dealing is actually a drug dealer; (2) that the place to be searched is possessed by, or the domicile of, the dealer; and (3) that the home contains contraband linking it to the dealer's drug activities." *United States v. Burton*, 288 F.3d 91, 104 (3d Cir. 2002); *accord Stearn*, 597 F.3d at 559.

Young erroneously reads *Williams* to add a fourth preliminary premise, *i.e.*, that the suspect's drug dealing is occurring "on a significant scale or for an extended period of time." (Doc. 81, p. 26 (quoting *Williams*, 974 F.3d at 351).) *Williams* did not hold that evidence of such large-scale drug trafficking is *necessary* to establish probable cause to search a residence. *See* 974 F.3d at 351. It simply explained that evidence of significant drug trafficking is one fact among many that may establish the third *Burton* premise. *Id*. Indeed, *Williams* does nothing to cast doubt on the Third Circuit's previous pronouncement that its "case law . . . suggests many factors [can] help establish the required nexus between a defendant's drug-dealing activities and his home." *Stearn*, 597 F.3d at 559. In addition to "large-scale operations," these factors may include "the proximity of the defendant's residence to the location of criminal activity [and] probable cause to arrest the defendant on drug-related charges." *Id.* at 559–560 (footnotes omitted). This makes sense. Young's reading of *Williams* would, as the

21

Government points out, have the absurd effect of making search warrants available only in the most serious drug-trafficking cases. (Doc. 73, p. 21.)

The magistrate that approved the Turner Warrant had a substantial basis to find probable cause that drugs would be found at the Premises. Officers observed: (1) no contraband in the CI's possession prior to the controlled buy; (2) the CI order a quantity of cocaine from a man on the phone, who told the CI to come pick up the drugs; (3) the CI drive up next to the Premises; (4) Turner exited the Premises, went directly into the CI's vehicle, and immediately returned to the Premises after exiting the vehicle; (5) the CI possessed after the controlled buy a white powdery substance that Detective Paul determined had the appearance of cocaine and was consistent with the quantity that the CI ordered. These facts easily satisfy *Burton*. *Cf. United States v. Thornton*, 559 F. App'x 176, 179 (3d Cir. 2014) (Probable cause to search dwelling existed when officers observed defendant "entering and exiting th[e] dwelling immediately before and after selling drugs on two separate occasions."); *United States v. Merchant*, 376 F. App'x 172, 176 (3d Cir. 2010) (Probable cause to search residence existed when officers observed a truck leave the residence for a designated controlled-buy location, confidential informant approached the truck and left with drugs, and the truck returned to the residence).

Young has failed to identify any legitimate basis for this court to second guess the approving magistrate's conclusion that probable cause existed to issue the Turner Warrant. Accordingly, law enforcement was not illegally present at the Premises on account of a defect in that warrant.

**B. Propriety of Protective Sweep of Young's Room**

Young next argues that law enforcement had no justification to perform a protective sweep of his room. He concedes that law enforcement was justified under *Buie* to perform a protective sweep of the area "immediately adjoining" the front first-floor living room where Turner was apprehended. (Doc. 81, p. 35.) He contests, however, that law enforcement had reasonable suspicion to extend their protective sweep to the second floor. (*Id.*) The Government makes no argument that the second floor or Young's Room was an area "immediately adjoining [a] place of arrest." *Buie*, 494 U.S. at 334. The issue, therefore, is whether officers had articulable facts to support a reasonable suspicion that the Premises potentially housed individuals that could pose a danger to law enforcement.

The reasonable-suspicion standard "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *White*, 748 F.3d at 511 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). Nevertheless, law enforcement's suspicion cannot be based simply on a "hunch," *Kansas v. Glover*, 589 U.S. 376, 380 (2020), or on "generalizations,"

23

*United States v. Jackson*, 414 F. Supp. 2d 495, 502–503 (D.N.J. 2006) (quoting

*United States v. Moran Vargas*, 376 F.3d 112, 116 (2d Cir. 2004)).  As *Buie* made

clear, law enforcement must rely on "articulable facts."  494 U.S. at 334.

The Government first contends that the protective sweep was justified on the

basis that law enforcement had probable cause to believe drugs were being

trafficked out of the residence.  (Doc. 73, p. 24.)  In support of this position, the

Government cites *United States v. Maldonado*, 472 F.3d 388 (5th Cir. 2006), and

*United States v. Cash*, 378 F.3d 745 (8th Cir 2004).  (Doc. 73, p. 24.)  Both of

those cases suggest that a protective sweep may be justified simply by the fact that

officers were executing a drug-related arrest.  *See Maldonado*, 472 F.3d at 394;

*Cash*, 378 F.3d at 748–49.  However, several courts have rejected this approach.

*United States v. Pemberton*, No. 1:18-cr-00099, 2019 WL 4045661, at *6 n.3 (D.

Me. May 17, 2019) (collecting cases).  Regardless, the court need not decide

whether it agrees with the *Maldonado* or *Cash* courts, because specific, articulable

facts justified the Entry Team's protective sweep of Young's Room.

Specifically, three considerations are collectively dispositive here.  The first

is that officers encountered more individuals than expected at the Premises.

Detective Paul initially assumed the Premises was a "single dwelling" in which

Turner lived, Hr'g Tr. 61:2–10, and he could not identify any other residents of the

24

Premises, Hr'g Tr. 41:23–42:4.[13]  Per HBP's typical practice, the Entry Team would have been briefed on Detective Paul's belief before executing the Turner Warrant.  (Hr'g Tr. 105:3–10.)  Therefore, the Entry Team was likely not expecting to encounter multiple individuals in the Premises.  Yet immediately upon entry, the Entry Team encountered both Turner and Young walking down the stairs.  Encountering more individuals than expected in a residence can justify a protective sweep.  *See United States v. Owens*, 187 F. Supp. 3d 488, 493 (M.D. Pa. 2016) (explaining that officers "naturally performed a protective sweep" when they unexpectedly encountered two additional adults in a home).

The second consideration is that Turner implied others were located in the Premises.  Upon detaining Turner, law enforcement asked him, "who else is here." (Gov't Ex. 9, 3:10–3:13.)  Turner responded, "it's a rooming house."  (*Id.* at 3:14– 3:16.)  Certainly, a reasonable suspicion can arise when an occupant gives the impression that others are actually present.  *See United States v. Howard*, 729 F. App'x 181, 187 (3d Cir. 2018) (affirming district court's reliance on fact that two individuals in townhouse refused to confirm whether others were present in aftermath of their arrests); *United States v. Morales-Ortiz*, 376 F. Supp. 2d 1131,

---

[13] The Turner Warrant lists "Andrew Clary" as an "owner, occupant or possessor" of the Premises.  (Gov't Ex. 1, p. 1.)  Clary is the Premises' owner, but Detective Paul did not believe Clary lived at the Premises.  (Hr'g Tr. 61:7–10.)

1141 (D.N.M. 2004) (relying on fact that "[t]he person at the door furthered the belief that more than one person may be in the house").

Finally, the court considers "the configuration of the [Premises], the general surroundings, and the opportunities for ambush." *See Starnes*, 741 F.3d at 808. After all, as *Buie* instructs, "[a]n ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." 494 U.S. at 333. Although identified as a rooming house, the Premises' configuration more so resembles that of a single-family townhouse. Nothing hinders individuals moving from floor to floor or room to room. The floors are joined by three internal staircases, two of which go from the first floor to the second. Each story's floor plan is not what one would call an "open concept." Walls and doors separate each discrete room, and the rooms are close to each other along narrow hallways. This configuration is particularly susceptible to potential ambush. An individual in any of the discrete rooms could easily and quickly mount an attack against law enforcement with little to no warning.

These specific considerations together gave law enforcement a sufficient basis to perform a protective sweep of the Premises, including Young's Room. Accordingly, law enforcement was not unlawfully present in Young's Room during that protective sweep.

26

## C. Unlawful Search of Young's Room

The question then becomes whether Corporal Banning and/or Lieutenant McGarrity actually saw suspected heroin bags in plain view during the lawful protective sweep or whether law enforcement found the bags during a subsequent search.  The latter would offend the Fourth Amendment.

While officers had lawful authority to conduct the protective sweep of Young's Room, they did not have authority thereafter to reenter it.  Put simply, the Turner Warrant did not authorize police to search Young's Room.  That warrant's original scope (*i.e.*, the entire building) was premised on the faulty assumption that the Premises was a single-family home.  Yet, officers knew it was a rooming house and, therefore, knew there was an "error in what they encountered versus what was authorized by the [Turner] [W]arrant."  *United States v. Ritter*, 416 F.3d 256, 266 (3d Cir. 2005).

Knowing this error, officers were "obligated," under the Fourth Amendment, "to either limit the search to those areas clearly covered by the warrant or to discontinue entirely their search" once they completed the protective sweep.  *Id.*; *accord Maryland v. Garrison*, 480 U.S. 79, 85 (1987).  This is true even though the Premises was purportedly an *illegal* rooming house.  *See United States v. Garner*, No. 1:19-cr-259, 2023 WL 3794513, at *9 (M.D. Pa. June 2, 2023) (applying

27

*Ritter* to an "unregistered multi-unit dwelling").[14]  Since nothing in the Turner Warrant establishes probable cause to specifically search Young's Room, a search following the protective sweep clearly would have violated Young's Fourth Amendment rights.

The evidence is unmistakable that law enforcement did not discover the suspected heroin bags during the protective sweep.  Corporal Banning and Lieutenant McGarrity—the only people who conducted the sweep—each testified that they did not see anything noteworthy in Young's Room.  (Tr. 83:1–10; 115:22–25.)  Their body-worn camera footage confirms that they entered Young's Room, performed a cursory search for individuals, and then left without making any mention of found contraband.  (Gov't Ex. 8, 5:35–6:51; Gov't Ex. 9, 5:25–6:55.)  Moreover, no body-worn camera footage captured either of them informing Corporal Harper that they found drugs in Young's Room.  This evidence convinces the court that drugs were not seeing during the lawful protective sweep.

Evidence to the contrary is not credible for two reasons.  First, seeing the suspected heroin bags and identifying them as such would have taken more time and effort than was necessary to dispel the concern that an individual was behind

---

[14] *Garner* reasons that not all rooming houses are multi-unit dwellings and notes that some courts have considered "houses with rooming arrangements . . . to be single-family residences."  2023 WL 3794513, at *6.  The Government makes no argument that the Premises was not a multi-unit dwelling that falls within the purview of *Garrison* and *Ritter*.

the door.  The space behind the door was just large enough to conceal an individual.  Any reasonable officer looking with a flashlight could have instantaneously determined whether an individual was there.  In fact, it took Lieutenant McGarrity a fraction of a second to confirm nobody was behind the door.  (Gov't Ex. 9, 5:36–37.)  In that same amount of time, it is doubtful officers could have noticed the suspected bags of heroin given their small size and unremarkable appearance.  Defense counsel accurately described at least one of the bags as "a crumbled up piece of paper."  (Hr'g Tr. 48:21–22.)  An officer would have needed more than a passing glance in a dark room to conclude the bags were suspected heroin bags.

Second, and relatedly, only the officers who had already seen the bags found in Turner's Room would have been able to discern the criminal nature of the bags found in Young's Room.  As Detective Paul testified, the only feature that made him think the bags in Young's Room were heroin bags was that one of them had the same red stamp that was located on the bags found in Turner's Room.  Law enforcement did not discover the bags in Turner's Room, however, until after the protective sweep of Young's Room.  So neither Corporal Banning nor Lieutenant McGarrity would have seen that stamp before purportedly seeing the heroin bags in Young's Room.  That timeline does not add up.

29

The only possible explanation for how law enforcement found the suspected bags of heroin is that a search of Young's Room occurred after the protective sweep. That leads the court to conclude that law enforcement's discovery was the result of an unconstitutional search.

## D. Exclusionary Rule

The court now must consider whether suppression is warranted. The answer ultimately depends on (1) whether the good-faith exception to the exclusionary rule applies and, if not, (2) whether the exclusionary rule should otherwise apply.

### 1. Good-Faith Exception

"The good-faith exception is a judicially created exception to th[e] judicially created [exclusionary] rule." *Davis*, 564 U.S. at 248. Key to assessing this exception's applicability is determining the "whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances.'" *Katzin*, 769 F.3d at 171 (quoting *Herring*, 555 U.S. at 145). If the answer is yes, the good faith exception does not apply. *See id.* The court must "examine the totality of the circumstances," including "not only any defects in the warrant but also the officer's conduct in obtaining and executing the warrant and what the officer knew or should have known." *Caesar*, 2 F.4th at 170 (quoting *Franz*, 772 F.3d at 147). The Government bears the burden of establishing the applicability of the good-faith exception. *United States v. Jones*, 818 F. Supp. 2d

30

845, 849 (E.D. Pa. 2011); *United States v. Fleet Mgmt. Ltd.*, 521 F. Supp. 2d 436, 441 (E.D. Pa. 2007).

The Government made its arguments on this issue without the benefit of knowing the court would conclude that law enforcement found the heroin bags during a subsequent, unconstitutional search rather than during the protective sweep. Understandably, the Government does not make any arguments that law enforcement conducted this subsequent search in good faith. It only contends that law enforcement's obtaining and executing the Turner Warrant and the protective sweep were all done in good faith. (Doc. 73, p. 27.) While this may be true, it is beside the point given the court's ruling. The critical question is whether law enforcement conducted the subsequent search of Young's room in good faith.

The Government proffered no evidence or arguments concerning that question, although it could have. The court asked the Government if it wanted to submit supplemental briefing after the evidentiary hearing, and the Government declined the opportunity. (Hr'g Tr. 119:4–15.) The court will not consider arguments that the Government has not advanced for itself. *See Hausknecht v. John Hancock Life Ins. Co. of N.Y.*, 614 F. Supp. 3d 168, 187 (E.D. Pa. 2022) ("This [c]ourt's role is not to craft arguments for the parties . . . .").

31

Regardless, after careful consideration of the evidence of record, the court does not conclude that the officers acted in good faith here. Several considerations lead to this conclusion.

First, all members of the search warrant entry team became aware the Premises was a rooming house almost immediately after entering the Premises. Appropriately, given the significance of this information, it was broadly communicated to the search team. There are many instances of officers informing each other the Premises is a rooming house. For instance, Lieutenant McGarrity announced on the team's radio, "they're saying it's a rooming house." (Gov't Ex. 10, 2:27–2:29.[15]) One officer told the forensic photographer that the Premises was a rooming house. (Gov't Ex. 9, 11:45–11:51.) And someone told Detective Paul upon his arrival at the Premises that it was a rooming house. (*See* Hr'g Tr. 44:24–45:2.) Under these circumstances, it would be unreasonable for any member of the team to not know the Premises was a rooming house.

Second, all members of the search warrant team were made aware of when the protective sweep of Young's Room began and ended. One officer clearly announced to other members of the Entry Team that "first and second [floors] are being cleared." (Gov't Ex. 10, 4:13–4:16.) More specifically, too, an officer announced over the radio that the Entry Team was entering Young's Room, and

---

[15] Government Exhibit 10 is footage from Corporal Harper's body-worn camera.

another officer acknowledge this statement. (Gov't Ex. 10, 3:48–3:55) After the protective sweep, Lieutenant McGarrity announced to officers on the second floor that he was "coming out" of Young's Room. (Gov't Ex. 9, 6:52–6:57.) He and other officers later confirmed that the second and third floors were "good." (Gov't Ex. 9, 11:03–11:07). Presumably, these confirmations were and should have been broadly communicated to the larger team, since no further work could be done before the sweep was over.

Knowing the above two pieces of information, a reasonably well trained officer would have known it was unlawful to enter Young's Room for the search that ultimately discovered the suspected heroin bags. For one, it has been settled for decades that a search warrant for what is thought to be a single family residence will not justify a search of every area of what turns out to be a multi-dwelling structure. *Garrison*, 480 U.S. at 85; *Ritter*, 416 F.3d at 266. So, too, Detective Paul acknowledged that HBP's usual practice is to limit searches of unexpected multi-unit dwellings—including "illegal rooming houses"—to common areas and the original target's unit. (Hr'g Tr. 19:2–9.) A reasonably well trained HBP officer should be aware of such practice, especially when it comports with law. For these reasons, the Government has failed to meet its burden of proving the good-faith exception applies here.

33

## 2. Culpability and Deterrence

The inapplicability of the good-faith exception is not a sufficient reason to justify suppression. *United States v. Wright*, 493 F. App'x 265, 272 (3d Cir. 2012) (*Wright I*); *United States v. Walker*, 763 F. Supp. 3d 664, 673 (E.D. Pa. 2025). Instead, Young carries the burden to show that officers' culpability justifies suppression. *Walker*, 763 F. Supp. 3d at 673. To carry this burden, he must prove law enforcement exhibited "deliberate, reckless, or grossly negligent conduct."[16] *Herring*, 555 U.S. at 144.

This case is unusual in that the court must analyze the culpability of an unknown actor. Young did not establish which individual officer unlawfully searched his room and found the suspected heroin bags. Accordingly, the court has very limited insight into the mind of that officer.

This evidentiary shortcoming, however, is not fatal to Young's motion. Under Supreme Court precedent, "[t]he pertinent analysis of deterrence and culpability is objective, not an inquiry into the subjective awareness of arresting officers." *Id.* at 145 (internal quotation marks omitted).[17] This means that

---

[16] There is no evidence or argument to suggest that the unlawful search here was a recurring or systemic issue in HBP.

[17] Confusingly, the Third Circuit has stated post-*Herring* "that an individual officer's mental state is relevant" to the culpability analysis. *United States v. Graves*, 613 F. App'x 157, 162 (3d Cir. 2015).

34

knowing the identity of the officer who conducted the unlawful search is not crucial to the analysis. The focus simply is—like with any objective test—whether particular *conduct* comports with what a reasonably trained officer would do under the same circumstances. *See id.* Admittedly, it is not clear how the court could analyze whether conduct was deliberate or reckless without considering the actor's subjective state of mind.[18] Fortunately, that theoretical issue need not be explored in this particular case, because the court can conclude that the law enforcement conduct was grossly negligent.

The distinction between ordinary and gross negligence is elusive. "Gross negligence is a nebulous term that is defined in a multitude of ways, depending on the legal context and the jurisdiction." *United States v. Wright*, 777 F.3d 635, 640 (3d Cir. 2015) (*Wright II*) (quoting 57A Am. Jur. 2d Negligence § 277). Generally, "gross negligence has 'been described as the want of even scant care and the failure to exercise even that care which a careless person would use.'" *Id.* (quoting *Fialkowski v. Greenwich Home for Children, Inc.*, 921 F.2d 459, 462 (3d

---

[18] Several authorities have questioned how conduct can be deemed deliberate or reckless without looking at the mental state of the actor. *See, e.g.*, *Herring*, 555 U.S. at 157 n.7 (Ginsburg, J., dissenting) ("It is not clear how the Court squares its focus on deliberate conduct with its recognition that application of the exclusionary rule does not require inquiry into the mental state of the police."); Albert W. Alschuler, *Herring v. United States; A Minnow or A Shark*, 7 OHIO ST. J. CRIM. L. 463, 485 (2009) ("The word 'deliberate' speaks unambiguously of the officer's state of mind. Even if there can be such a thing as 'objective good faith,' there is no such thing as 'objectively deliberate wrongdoing.'").

Cir.1990)); *accord* Gross Negligence, *Black's Law Dictionary* (12th ed. 2024) ("A lack of even slight diligence or care.")  Ordinary negligence, on the other hand, generally "means no more than a failure to measure up to the conduct of a reasonable person."  *Wright II*, 777 F.3d at 640 (quoting *Fialkowski*, 921 F.2d at 462).

Recognizing that these "hornbook formulations" provide little guidance, the Third Circuit has instructed courts to consider two factors when deciding whether law enforcement conduct was negligent or grossly negligent in the Fourth Amendment context.  *Id.*  The first is "the extent to which the violation in this case undermined the purposes of the Fourth Amendment."  *Id.*  Those purposes are threefold:

> First, it provides written assurance that the Magistrate actually found probable cause to search for, and to seize, every item mentioned. Second, it prevents general searches by confining the discretion of officers and authorizing them to seize only particular items.  Third, it informs the subject of the search of the lawful authority of the executing officer, his need to search, and the limits of his power to search.

*Id.* (internal citations and quotation marks omitted).

The unlawful search of Young's Room undermined all three of these purposes.  As to the first and third purposes, the Turner Warrant did not even mention or allude to Young, let alone describe any alleged conduct of his or identify his room as a place to be searched.  Without that type of information, it cannot be said the Turner Warrant provided "written assurance" that a neutral

36

magistrate found probable cause to search Young's Room. Nor can it be said the Turner Warrant apprised Young—the target of the unlawful search—of law enforcement's authority to conduct the search of his room, why they needed to do the search, and what the limits of the search would be.

More troubling in this circumstance is the extent to which law enforcement undermined the second purpose. It is clear officers exercised direction that the Fourth Amendment is designed to restrain, even when they knew they should not have. As noted above, the officers who executed the Turner Warrant knew or should have known that the Premises was a rooming house by, at the latest, the time the protective sweep of the Premises concluded. They also knew or should have known when the protective sweep of Young's Room concluded. With this information, law enforcement knew or should have known that the Fourth Amendment would not permit a further search of Young's Room without a warrant. Nonetheless, law enforcement still embarked on an "exploratory rummaging" through Young's Room, effectively converting the Turner Warrant into a general warrant. *See Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971) (explaining that a general warrant's "problem" is that it permits "a general, exploratory rummaging in a person's belongings"). Such conduct warrants deterrence.

37

The second factor is "what the Government gained from the violation." *Wright II*, 777 F.3d at 640.  Law enforcement substantially benefited from the unlawful search.  Detective Paul conceded that law enforcement did not have probable cause to search Young's person or residence before executing the Turner Warrant.  (Hr'g Tr. 36:18–37:2.)  That changed as a result of the unlawful search.  As a result of the unlawfully-obtained information about the two heroin bags found in Young's room, officers obtained a warrant to search Young's room and then seized thousands of bags of heroin, among other contraband.  Unlike *Wright II*— where the "[t]he violation . . . had no impact on the evidence that could be deployed against [the defendant] at trial,"  777 F.3d at 641—law enforcement's violation was a but-for reason they could bring criminal charges against Young in the first place.

The court is mindful that police may have been able to obtain probable cause to search Young's Room through further investigation.  That was possible given that the CI had previously mentioned Young to Detective Paul.[19]  (Gov't Ex. 2, p. 2.)  Regardless of whether they *could*, officers still had a significant incentive to commit the constitutional violation, *i.e.*, establishing probable cause that Young committed a crime without expending additional resources to conduct further investigation.  *Cf. Hudson*, 547 U.S. at 596 (suggesting incentive is high when the

---

[19] To be clear, the Government does not argue that the independent source doctrine applies here.

violation "produces incriminating evidence that could not otherwise be obtained"). The strength of this incentive enhances the deterrence value of suppression. *See Wright II*, 777 F.3d at 640 (quoting *Hudson*, 547 U.S. at 596.)

The above analysis leads to the conclusion that law enforcement exhibited gross negligence in this case and, therefore, suppression's deterrence value outweighs its substantial social costs. Therefore, the court will suppress evidence of everything found in Young's Room and all evidence derived therefrom. *See Utah v. Strieff*, 579 U.S. 232, 237 (2016) ("[T]he exclusionary rule encompasses both the primary evidence obtained as a direct result of an illegal search or seizure and . . . evidence later discovered and found to be derivative of an illegality." (Internal quotation marks omitted).)

## E. Alleged False Statements in Young Warrant

Young's final argument is that the Young Warrant was constitutionally infirm, because it was based on an affidavit with materially false statements that Detective Paul knowingly or recklessly made. (Doc. 81, p. 8.) The court need not address this dispute. Suffice it to say that obtaining the Young Warrant did not legitimize the seizure of the evidence in Young's Room. Law enforcement obtained probable cause to justify the Young Warrant via an unconstitutional search. Such probable cause is the "fruits of a Fourth Amendment violation" and cannot "legally form the basis for an arrest or search warrant." *Alderman v. United*

39

*States*, 394 U.S. 165, 177 (1969); *accord United States v. Burton*, 193 F.R.D. 232, 243 (E.D. Pa. 2000) ("[A] warrant cannot be supported by illegally discovered evidence.").

## CONCLUSION

For the aforementioned reasons, the court will grant Young's motion. An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: June 4, 2026